Nelson CHASE, individually and on behalf of all others similarly situated, Plaintiff,

v.

NORTHWEST AIRLINES CORP., Northwest Airlines, Inc., and Airline Reporting Corporation, Defendants.

No. 96–74711.

United States District Court, E.D. Michigan, Southern Division.

April 23, 1999.

Barry Taus, Garwin Bronzaft, New York City, Robert Harwood, Wechsler Harwood, New York City, Elwood Simon, Simon & Associates, Birmingham, MI, Susan Lacava, Madison, WI, Donald Bramlage, Farmington Hills, MI, Marvin Miller, Miller, Faucher, Ann Arbor, MI, for plaintiff.

Lawrence Campbell, Mary Beth Kelly, Dickinson, Wright, Detroit, MI, Parker Folse, III, Susman Godfrey, LLP, Seattle, WA, Donald Flexner, Kent Gardiner, Crowell & Moring, Washington, DC, for defen-

dants Northwest Airlines Corp. and Northwest Airlines, Inc.

J. Thomas Lenga, Clark, Hill, Detroit, MI, Kevin McDonald, Jones, Day, Reavis & Pogue, Washington, DC, for defendant Airline Reporting Corporation.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

ROSEN, District Judge.

### I. INTRODUCTION

This anti-trust case is presently before the Court on separate Motions to Dismiss filed by Defendants Northwest Airlines ("Northwest") and Airline Reporting Corporation ("ARC"). In substance, Plaintiff's lawsuit under sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 et seq., challenges Northwest's "hub-and-spoke" route system and, more specifically, the airline's policy of refusing to sell cheaper spoke-hub-spoke tickets to passengers originating or terminating their travel at a hub airport. In addition to bringing a monopolization claim under § 2, Plaintiff alleges that Defendants entered into several conspiracies in violation of § 1 designed to implement and enforce Northwest's refusal to sell policy.

In their present Motions to Dismiss under Fed.R.Civ.P. 12(b)(6), Defendants argue that Plaintiff's Second Amended Complaint fails to adequately plead a legally cognizable conspiracy. As support for this argument, Defendants rely on the intracorporate conspiracy doctrine and their characterization of the Second Amended Complaint as averring only unilateral con-

duct on the part of Northwest. Defendants further argue that, standing alone, allegations of anti-competitive effects on intrabrand competition are insufficient to support claims under either § 1 or § 2 of the Sherman Act.

The Court held a hearing on Defendants' motions on November 24, 1998. Having heard the oral arguments of counsel and having reviewed the briefs and supporting documents submitted by the parties, the Court is now prepared to rule on Defendants' motions. This Opinion and Order sets forth the Court's Ruling.

### II. FACTUAL BACKGROUND

#### A. The Parties

##### 1. Northwest

Northwest is one of the world's largest passenger airlines, providing service to customers in over 40 states, the District of Columbia, Mexico, Canada, the Carribean, Europe, China, and Japan.[1] In the United States, the airline operates primarily through a "hub-and-spoke" system, discussed in detail *infra*, with hub airports in Detroit, Memphis, and Minneapolis/St. Paul. [2nd Amend.Compl., ¶ 4–5]. Northwest's air services are sold through a dual distributorship network, which allows customers to purchase tickets either directly from the airline or from independently-owned travel agents that generally sell tickets for a variety of airlines and earn a commission on each sale.[2] According to Plaintiff, independent travel agents sell 80% or more of Northwest's tickets. [2nd Amend.Compl., ¶ 8].

---

1. Measured by revenue passenger miles, Northwest was the world's fourth largest passenger airline as of 1993. The airline's annual revenues exceeded $ 9 billion in 1995 and 1996. [2nd Amend.Compl., ¶ 4].

2. Unlike a traditional resale distribution scheme, where a dealer purchases an inventory of products/services from a manufacturer/service provider for resale, travel agents

generally do not maintain a separate inventory of airlines tickets/seats and, as such, do not bear the risk of unsold inventory. Furthermore, travel agents have no authority to set prices, and no ability to sell a seat without first checking with an airline for availability. *See, Illinois Corporate Travel, Inc. v. American Airlines, Inc.,* 806 F.2d 722, 725 (7th Cir. 1986); 2nd Amend.Compl., ¶ 8.

### 2. *ARC*

The major passenger airlines formed ARC in 1984 in order to create: (1) a common accreditation program for travel agents; and (2) a centralized clearinghouse program for travel agents to report, settle, and account for airline ticket sales on behalf of all participating carriers. [2nd Amend.Compl., ¶¶ 6, 59]. ARC's Articles of Incorporation permit up to 30 airlines to own no more than one share of ARC stock each and to retain no more than one representative on ARC's Board of Directors.[3] [2nd Amend.Compl., ¶ 6]. Moreover, approximately 140 airlines participate in the ARC program, which in 1995 accounted for 93% of the emplanements in the United States and 96% of airline revenues. [2nd Amend.Compl., 16].

Airlines participate in ARC by signing an ARC Carrier Services Agreement, which provides, *inter alia:* (1) that each of ARC's airline members participate in the ARC program; (2) the authority for ARC to act on behalf of all of its airline members collectively in certifying travel agents for ARC's airline members; (3) the authority for ARC to sign contracts with travel agents on behalf of all its airline members collectively; and (4) that each of ARC's airline members subscribe to the rules and regulations promulgated by ARC. [2nd. Amend.Compl., ¶ 57].

Using its authority under the Carrier Service Agreement, ARC enters into ARC Agent Reporting Agreements on behalf of its participating carriers with travel agents across the country. Travel agents must sign on to the ARC Agent Reporting Agreement in order to sell tickets for any participating carrier. [2nd Amend.Compl., ¶ 58].

**3.** As of November 1984, 18 airlines had executed stock subscription agreement to become ARC shareholders, including Northwest, American, Continental, Delta, TWA, United, and USAir. [2nd Amend.Comp. ¶ 6].

**4.** Accordingly, Plaintiff defines the relevant product market as "air passenger service" and the relevant geographic markets as air-

### 3. *Plaintiff*

Plaintiff, Nelson Chase, brings this action on behalf of himself and all others similarly situated who purchased a Northwest full fare first class or full fare coach class ticket from or through a travel agent for air service originating or terminating at one of Northwest's hub airports during the period of October 10, 1992 to the present.[4] More specifically, Plaintiff alleges that class members "were injured in their business and property because the prices that they paid Northwest for such air service to and from the Hubs were artificially inflated by Defendants' illegal and anticompetitive" refusal to sell policy. [2nd Amend.Compl., ¶ 10].

### B. *Northwest's Hub–and–Spoke Route System*

As noted above, Northwest utilizes a "hub-and-spoke" route system, whereby the airline's hub airports (Detroit, Memphis, and Minneapolis/St. Paul) serve as central connecting points for flights between spoke cities such as New York and Columbus. For example, rather than offering a direct flight between New York and Columbus, Northwest requires passengers to purchase combination tickets which actually include two flights—an initial flight from New York to Detroit and a second connecting flight from Detroit to Columbus.[5] Given the high costs of maintaining a hub airport, the successful operation of such a system requires an adequate supply of both hub traffic and connecting spoke traffic. Stated another way, airlines need to minimize their planes' idle ground time at hub airports, during which the planes are occupying valuable gate space and not generating revenues. This re-

line routes originating or terminating at one of Northwest's hub airports. [2nd Amend. Compl., ¶ 23].

**5.** Spoke-hub-spoke passengers actually receive ticket vouchers for two discrete flights. [2nd Amend.Compl., ¶ 22].

quires a steady stream of both hub traffic and spoke traffic, which allow planes to quickly refill with passengers and depart after landing.[6] [2nd Amend.Compl., ¶¶ 32–35].

In the present case, the parties vigorously dispute the competitive merits of the hub-and-spoke system. Northwest argues that its hub-and-spoke route system enables the airline to offer competitive service on thousands of city-pair routes across the United States, in competition with the hub-and-spoke networks developed by other airlines. In contrast, Plaintiff argues that the hub-and-spoke system allows Northwest to charge supra-competitive monopoly prices to passengers originating or terminating their travel at a hub airport.

Whatever the merits of the hub-and-spoke system, it creates a phenomenon whereby passengers pay markedly different amounts for essentially identical air service. For example a New York–Detroit–Columbus combination ticket offers the same service as a New York–Detroit hub ticket and a second Detroit–Columbus hub ticket, but at a price considerably lower than either of the hub tickets alone.[7] According to Plaintiff, this price anomaly stems primarily from the fact that an airline generally controls the vast majority of gates and flights at its hub airports.[8] As a result, Plaintiffs argue that the carrier can charge above competition monopoly prices to passengers who originate or terminate

their travel at hub airports without losing market share.[9] In contrast, competing airlines service spoke-hub-spoke routes through their own respective hub-and-spoke networks. Competition on spoke-hub-spoke routes results in lower prices for these passengers, whom an airline could potentially lose to a competing carrier.

## C. Northwest's Refusal To Sell/Hidden Ticket Policy

Ever cognizant of price, passengers began realizing that they could avoid more expensive hub tickets by simply purchasing spoke-hub-spoke combination tickets and flying on only one leg of the flight. For example, a New York–Detroit passenger would purchase a less expensive New York–Detroit–Columbus ticket and simply deplane in Detroit, disregarding the connecting flight to Columbus. In order to counteract this practice by consumers and protect its profits on hub routes, Northwest implemented a policy around 1987 of refusing to sell less expensive spoke-hub-spoke combination tickets to passengers initiating or terminating their travel at a hub airport. [2nd Amend.Compl., ¶¶ 48–50]. Plaintiff further alleges that the airline took additional steps to buttress its refusal to sell policy including: (1) requiring passengers to check baggage through to their final destination; and (2) canceling a passenger's ticket and reservation for any remaining segments on a combination

---

6. Plaintiff cites a 1996 article in which Northwest's CEO and President stated, "As a rule of thumb, a Hub–and–Spoke system is about 50 percent local traffic and 50 percent connecting traffic." [2nd Amend.Compl., ¶ 35].

7. As of September 29, 1995, a one-way full fare New York–Detroit ticket cost approximately $394.00, while a one-way full fare New York–Detroit–Columbus combination ticket cost $238.73. [2nd Amend.Compl., ¶ 40].

8. From 1990 to 1996, Northwest controlled 70–75% of departures from Detroit; 69–77% of departures from Memphis; and 77–79% of departures from Minneapolis/St. Paul. In ad-

dition, as of October 1996, Northwest controlled approximately 74% of the gates at Detroit's Metropolitan Airport. [2nd Amend. Compl., ¶¶ 24, 26].

9. Plaintiff cites an April 1996 Department of Transportation study which found that in comparison to passengers flying in non-dominated markets of similar distance and density, Detroit residents and visitors paid 2.2% more in 1988, 22.2% more in 1994, and 20.7% more in the first three quarters of 1995. The figures for Minneapolis for the same time periods were 23%, 42.3%, and 40.8%. Similarly, Memphis' figures were 32.9%, 35.5%, and 35.9%. [2nd Amend.Compl., ¶ 29].

ticket whenever a passenger does not use one of the segments on a spoke-hub-spoke ticket.[10] [2nd Amend.Compl., ¶¶ 68–74].

### D. *The Alleged § 1 Conspiracies*

The parties agree that the Second Amended Complaint alleges the following two conspiracies in violation of § 1 of the Sherman Act: (1) a conspiracy between Northwest and non-defendant travel agents; and (2) a conspiracy between Northwest and ARC itself. [2nd Amend. Compl., ¶¶ 76, 79]. Plaintiff also contends, and Defendants dispute, that the Second Amended Complaint adequately pleads a § 1 conspiracy among ARC's participating carriers.[11]

### 1. *Non–Defendant Travel Agents*

Plaintiff alleges that Northwest conspired with non-defendant travel agents: (1) to investigate the final destination of consumers who purchased Northwest's spoke-hub-spoke tickets; and (2) to refuse to sell spoke-hub-spoke tickets to consumers that the agent suspected did not intend to use the full ticket. [2nd Amend.Compl., ¶ 52]. According to Plaintiff, this conspiracy is evidenced by numerous written agreements between Northwest and travel agents, including the ARC Agent Reporting Agreement, which require travel agents to comply with Northwest's ticketing policies and procedures. Importantly, Plaintiff alleges that Northwest enforced its agreement with travel agents through the following penalties and sanctions: (1) by issuing "debit memos" to travel agents that violate the refusal to sell policy equal to the difference in price between spoke-hub-spoke combination tickets and hub tickets; and (2) by threatening to rescind an agent's authority to issue tickets for Northwest and potentially any ARC member airline. [2nd Amend.Compl., ¶ 54]. Plaintiff further alleges that the net effect

of these penalties and threats is to shift the risk of loss of Northwest's refusal to sell policy onto travel agents, who have no choice but to comply with the airline's ticketing rules. [2nd Amend.Compl., ¶ 55].

### 2. *ARC*

As evidenced by the ARC Air Carrier Services Agreement, Plaintiff also alleges an illegal conspiracy between Northwest and ARC. While not questioning the airlines' initial right to form and use ARC as a central clearinghouse, the Second Amended Complaint alleges that:

> By: (a) remaining party to the ARC Agent Reporting Agreement after Northwest announced its illegal efforts to restrict the sale of two-segment combination tickets to Hub travelers; and (b) continuing to audit and enforce travel agents' compliance with Northwest's illegal rules and instructions, ARC has abused the power of its collective membership to assist Northwest in enforcing and implementing its illegal practice.

[2nd Amend.Compl., ¶ 66].

With respect to the structure of ARC, the Second Amended Complaint provides that ARC is "a combination and conspiracy of airlines," and that Northwest and ARC:

> ... entered into a contract or agreement, or engaged in a conspiracy and/or combination in restraint of trade or commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the purpose and effect of which was to: (a) assist Northwest in fixing and maintaining prices for air passenger service originating from, or terminating at, its Hub at supra-competitive, monopoly levels, and (b) unreasonably restrain interstate trade and commerce and competition.

[2nd Amend.Compl., ¶ 76].

The Complaint further provides:

---

10. Thus, a passenger with a round-trip New York–Detroit–Columbus ticket who only traveled as far as Detroit could not get back to New York.

11. The question of whether the Second Amended Complaint adequately pleads a § 1 conspiracy among ARC's participating carriers is discussed in detail, *infra*.

[T]hrough various contracts and agreements, ARC has the authority to act on behalf of all its airline members collectively in determining who is qualified to act as a travel agent for ARC's airline members. ARC's unilateral power to decide who is eligible to sell tickets for any of ARC's airline members (which constitute virtually all of the airlines in the United States) concentrates in ARC's hands the combined power of all its members to effectively exclude a person or entity from working as a travel agent. This is a far greater exclusionary power than any of the airlines exercises alone.... ARC uses its concentrated exclusionary power ... to aid its member airlines in enforcing their various rules and regulations against travel agents.

[2nd Amend.Compl., ¶ 59].

### E. *Procedural History*

Plaintiff originally filed this action on October 11, 1996.[12] On August 13, 1997, Plaintiff filed a three-count amended class action complaint alleging: (1) that Defendants conspired to restrain trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1; (2) monopolistic behavior by Northwest in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; and (3) violations of the Michigan Antitrust Reform Act, M.C.L. §§ 445.772, 445.773. In response to the Amended Complaint, Defendants filed their instant Motions to Dismiss on September 5, 1997. With the Court's permission, Plaintiff filed a Second Amended Class Action Complaint on March 16, 1998, which continued to allege violations of the Sherman Act, but no longer claimed violations of Michigan law. Upon the request

of Defendants, the Court informed that parties that it would apply Defendants' pending Motions to Dismiss to the Second Amended Complaint.

### III. *ANALYSIS*

### A. *Standards Applicable to Motions to Dismiss*

In considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, the Court must accept the well-pleaded factual allegations set forth in the plaintiff's complaint as true. *See, Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir. 1987) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); *Westlake v. Lucas;* 537 F.2d 857, 858 (6th Cir.1976). However, the Court need not accept as true legal conclusions or unwarranted factual inferences. *See, Morgan, supra; Westlake, supra. See also, Blackburn v. Fisk University,* 443 F.2d 121, 124 (6th Cir.1971) (the court is "required to accept only well-pleaded facts as true, not the legal conclusions that may be alleged or that may be drawn from the pleaded facts.")

### B. *Plaintiff's Section 1 Claims*

In order to state a valid claim under § 1 of the Sherman Act, an anti-trust plaintiff " 'must establish that the defendants combined or conspired with an intent to unreasonably restrain trade.' "[13] *Nurse Midwifery Associates v. Hibbett,* 918 F.2d 605, 611 (1990) (quoting *Smith v. Northern Mich. Hosps.,* 703 F.2d 942, 949 (6th Cir. 1983)). Section 1 does not address unilateral conduct and, as such, a court must

---

**12.** This case was originally assigned to the Honorable Horace W. Gilmore. On November 21, 1997, the case was reassigned to the Honorable John C. O'Meara. On December 1, 1997, Judge O'Meara disqualified himself from the case, which was then assigned to Judge Rosen.

**13.** Section 1 of the Sherman Act emphatically declares, "Every contract, combination in the form of trust or otherwise, or conspiracy, in

restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. Despite this emphatic language, the Supreme Court has long held that § 1 prohibits only unreasonable restraints of trade. *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988).

determine that a legally cognizable conspiracy between two separate entities actually exists prior to assessing the reasonableness of a defendant's conduct:

> It is crucial that a plaintiff demonstrate that there has been a contract, combination, or conspiracy between separate entities, because section 1 does not reach unilateral conduct even if such conduct unreasonably restrains trade. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984). Unilateral conduct is governed by section 2 of the Sherman Act, 15 U.S.C. § 2, "and is unlawful only when it threatens actual monopolization." *Id.* Under section 1, only after the court has found that there was a conspiracy will it examine whether the conduct was unreasonable.

*Nurse Midwifery*, 918 F.2d at 611–612.

As noted above, the parties agree that in the present case, the Second Amended Complaint alleges that Northwest entered into conspiracies with two separate entities, the non-defendant travel agents and ARC. [2nd. Amend.Compl., ¶¶ 76–80]. The Court will address each of these allegations in turn.

### 1. *Non–Defendant Travel Agents*

■ With respect to the non-defendant travel agents, Plaintiff alleges that Northwest coerced the agents into the conspiracy by "threatening to rescind an agent's authority to issue Northwest tickets, which could, in turn, cause the travel agent to be effectively banned from the entire travel agent industry by being precluded from issuing tickets for any ARC member airline." [2nd. Amend.Compl., ¶ 54]. In making these allegations, however, Plaintiff fails to recognize that a § 1 conspiracy cannot exist where a dealer or distributor of a product involuntarily complies with a

producer's sales policies to avoid termination of his product source. *See, International Logistics Group, Ltd. v. Chrysler Corporation*, 884 F.2d 904, 907 (6th Cir. 1989).

*International Logistics* involved a § 1 challenge by several dealers of Chrysler replacement parts who refused to comply with Chrysler's international marketing policies for the Power Master engine. Interparts, a division of Chrysler, sold Power Master engines internationally at unit prices substantially below that charged in the domestic market. The company also sold Power Masters to dealers of Chrysler replacement parts, who in reselling the engines were required to comply with Chrysler's international marketing policy. When the plaintiffs violated the policy, Chrysler canceled all their orders for Power Master engines. In response, the plaintiffs brought an action under the Sherman Act alleging, *inter alia*, that Chrysler had illegally conspired to restrain trade in violation of § 1. After first noting that Chrysler had unilaterally formulated and uniformly implemented its marketing policy, the Sixth Circuit concluded that "[c]urrent legal precedent supports the conclusion that a conspiracy may not evolve under circumstances where a dealer or distributor involuntarily complies to avoid termination of his product source." *International Logistics*, 884 F.2d at 907. The Sixth Circuit then proceeded to adopt the following unambiguous rule: "There can be no conspiracy 'where the actor imposing the alleged restraint does not ... need the acquiescence of the other party or any quid pro quo from him.'" *Id.* (citing 6 P. Areeda, Antitrust Law ¶ 1402b4, at 16 (1986)).[14]

■ Returning to the present case, the alleged conspiracy between Northwest and the non-defendant travel agents falls

---

**14.** The Sixth Circuit also cited with approval the district court's reliance on the principle enumerated in *Barnosky Oils, Inc. v. Union Oil Co.*, 665 F.2d 74, 79–80 (6th Cir.1981), that where a § 1 conspirator "merely exercis-

es its unilateral power no antitrust concerted action is possible even if defendant forced others to unwillingly acquiesce in defendant's restraints." *International Logistics*, 884 F.2d at 907 (internal quotations omitted).

squarely within the boundaries of *International Logistics*. Analogous to the dealers' forced compliance with Chrysler's marketing policy in *International Logistics*, Plaintiff alleges that Northwest forced travel agents to comply with the airline's refusal to sell policy by threatening the elimination of their product source—in this case the right to sell tickets for Northwest and potentially all other airlines. Moreover, the Second Amended Complaint contains no allegations that travel agents played any role whatsoever in formulating what Plaintiff himself repeatedly describes as Northwest's refusal to sell policy. In sum, the Second Amended Complaint alleges that Northwest unilaterally formulated its refusal to sell policy, and that all travel agents were required to comply.[15] As such, Plaintiff's Complaint has failed to plead a legally cognizable conspiracy between Northwest and the non-defendant travel agents and, accordingly, must be dismissed as to these claims.

### 2. *ARC*

Relying on *International Logistics*, ARC similarly argues that the Court must dismiss the claimed § 1 conspiracy between Northwest and ARC because Plaintiff fails to allege that the airline needed the acquiescence of ARC to adopt and enforce its refusal to sell policy. An examination of the Second Amended Complaint, however, belies ARC's argument. Unlike the allegations with respect to the non-defendant travel agents, the Second Amended Complaint expressly alleges that ARC played a crucial and necessary role in the refusal to sell conspiracy by "blacklisting" travel agents who failed to comply with Northwest's refusal to sell policy. [2nd Amend.Compl., ¶¶ 60–61, 64]. More specifically, Plaintiff contends that under the ARC Agent Reporting Agreement, if a travel agent does not comply with an airline's rules, ARC can strip the agent of the documents and hardware needed to issue tickets for all of ARC's 140 member airlines. Without ARC's ability to "blacklist" travel agents from all ARC member airlines, a travel agent that lost ticketing privileges for Northwest could simply divert spoke-hub-spoke travelers from Northwest to the routes of other airlines. Thus, Plaintiff expressly alleges that in the absence of ARC's assistance, Northwest could not implement its refusal to sell policy without risking the loss of spoke-hub-spoke travelers integral to the success of its hub-and-spoke system. These allegations, if true, clearly establish that Northwest needs the acquiescence of ARC to successfully carry out its refusal to sell policy.

Although their acquiescence argument lacks merit, Defendants do correctly argue that Plaintiff's alleged § 1 conspiracy between Northwest and ARC itself is barred by the intra-corporate conspiracy doctrine. The Sixth Circuit recognizes several exceptions to the general rule that coordinated conduct between separate entities constitutes a conspiracy under § 1. Included among these exceptions is the intra-corporate conspiracy doctrine, under which a corporation and its agents are viewed as a single entity for purposes of § 1 of the Sherman Act, barring any conspiracy claim. *See, Nurse Midwifery*, 918 F.2d at 612 ("a corporation cannot ordinarily conspire with its agents or employees"); *Potters Medical Center v. City Hospital Association*, 800 F.2d 568, 573 (6th Cir.1986); *Smith v. Northern Mich. Hosps.*, 703 F.2d 942, 950 (6th Cir.1983).

In *Potters Medical Center*, the Sixth Circuit explained the reasoning behind the

---

**15.** Plaintiff's Brief in Opposition describes the travel agents as "unwilling co-conspirators" who entered into a "coerced agreement" with Northwest. [Brief in Opposition, pp. 28, 30; *See also*, 2nd AmendCompl., ¶ 87(b)]. Likewise, Plaintiff acknowledges the unilateral nature of Northwest's conduct: "ARC has pledged that it will use the combined market power of its 140 airlines to blindly support any rule that an airline member *unilaterally* imposes on travel agents, regardless of how improper or illegal the rule may be." [Brief in Opposition, p. 35].

intra-corporate conspiracy doctrine as follows:

> The rationale is that officers or agents of a single firm share unity of economic purpose with the firm, so that agreements, combinations or concerted actions among them do not impermissibly coalesce economic power that was previously directed toward divergent goals.

800 F.2d at 573 (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984)). Thus, *Potters Medical Center* and its progeny instruct that agency status alone will not suffice to bring an alleged § 1 conspiracy within the parameters of the intra-corporate conspiracy doctrine. Rather, in order for the doctrine to apply, a principal and agent must share a unity of economic purpose.

The leading case applying the intra-corporate conspiracy doctrine in the Sixth Circuit is *Nurse Midwifery, supra.* Plaintiffs in *Nurse Midwifery* included two nurse midwives seeking practice privileges at several Nashville area hospitals. In analyzing the midwives' requests, the hospitals' medical staffs recommended the denial of privileges. When the hospitals accepted the recommendations, the midwives brought suit alleging, *inter alia,* an actionable § 1 conspiracy between the hospitals and their medical staffs.[16] In first addressing the agency prong of the intra-corporate conspiracy doctrine, the Court found that under traditional agency principles, members of a hospital's medical staff clearly act as agents of the hospital in making privilege recommendations. The Court then noted, however, that a hospital's medical staff did not necessarily share a unity of economic purpose with its principal. "[M]edical staff are not salaried employees of the hospital but are independent medical practitioners, some in direct competition with each other and with applicants for privileges." *Nurse Midwifery,* 918 F.2d at 614. Nonetheless, the Court

found that because a hospital and its medical staff are not competitors, the intra-corporate conspiracy doctrine barred the midwives' § 1 claim:

> Section 1 of the Sherman Act is concerned only with concerted action among competitors and not the coordinated activities that occur within a single firm. As the Weiss court held, when determining whether the intra-corporate conspiracy doctrine applies to an alleged conspiracy between a hospital and its medical staff, there are no strong antitrust concerns that would warrant a departure from traditional concepts of agency since the hospital and medical staff are not competitors. The fact that the medical staff may have acted with anticompetitive motives is not sufficient to warrant a finding that a hospital's decision to accept the staff recommendation is an antitrust conspiracy.

*Id.*

 Returning to the present case, the facts as pled by Plaintiff clearly establish that ARC acts as Northwest's agent with respect to certifying travel agents and enforcing the airline's ticketing policies. In particular, Plaintiff alleges that Northwest's Carrier Services Agreement with ARC grants ARC the power to enter into contracts with travel agents on behalf of Northwest and to enforce Northwest's ticket rules. Using this power, ARC enters into Agent Reporting Agreements with travel agents that grant the agents the right to sell Northwest tickets in return for their promises to comply with Northwest's ticketing policies. Thus, Northwest has effectively granted ARC a power-of-attorney to certify by contract those travel agents that are qualified to sell Northwest tickets. "A power of attorney is an instrument in writing by which one person, as principal, appoints another as his agent and confers upon him the authority to perform certain specified acts or kinds of acts on behalf of the principal."

---

**16.** As discussed, *infra,* the midwives also alleged § 1 conspiracies by several pediatri-

cians on one hospital staff and by several obstetricians on another hospital staff.

3 AmJur2d, Agency, § 23 p. 528 (citations omitted). Accordingly, the Court finds that ARC acts as Northwest's agent so far as it certifies travel agents and enforces the airline's refusal to sell policy.

Furthermore, analogous to the hospital and medical staff in *Nurse Midwifery,* the facts as pled by Plaintiff clearly show that Northwest and ARC itself do not compete in the relevant market for airline passengers. Indeed, the Second Amended Complaint expressly alleges that ARC has no economic interest separate and independent from its member airlines:

> ARC's existence, and the continued compensation of its directors, officers and/or employees, was dependent upon ARC's continued ability and willingness to abide by the wishes of its member carriers. If, as a general matter, ARC began to selectively refuse to enforce airlines' rules, it brought into question its entire reason for existence.

[2nd Amend.Compl., ¶ 67]. Thus, viewed one-dimensionally as only an agreement between Northwest and ARC as a single entity, Northwest and ARC do share a complete unity of economic purpose with respect to the airline's refusal to sell policy, and the alleged agreement between the entities does not "impermissibly coalesce economic power that was previously directed toward divergent goals." *Potters Medical Center,* 800 F.2d at 573. But, this does not end our inquiry into ARC's status and relationship with Northwest as to the antitrust allegations raised by Plaintiff's Complaint because it does not address the question of what type of organization ARC is with respect to Northwest and its competitor airlines.

█ Recognizing this in his Second Amended Complaint, Plaintiff argues that ARC's actions to enforce the refusal to sell policy actually evidence a conspiracy among Northwest and other ARC member airlines in that ARC is the instrument by which these competing airlines operate to impose anti-competitive conduct on consumers under the guise of operating uni-

laterally. [Brief in Opposition, pp. 35–40]. In response, ARC offers the following two arguments: (1) that the Second Amended Complaint fails to plead a conspiracy among ARC's participating carriers; and (2) regardless of whether the Court views ARC as a single entity or as a joint venture of competing airlines, the intra-corporate conspiracy doctrine would still bar Plaintiff's claim. [Reply Brief, pp. 8–10].

In first analyzing ARC's sufficiency of the pleadings argument, the Court notes that the notice pleading requirements of Rule 8 simply require Plaintiff to make "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). This rule seeks "to avoid technicalities and to require that the pleading discharge the function of giving the opposing party fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved." Wright & Miller, Federal Practice and Procedure: Civil 2d § 1215; *See also,* Schwarzer, Tashima & Wagstaffe, Rutter Group Prac. Guide: Fed.Civ.Pro. Before Trial § 8:29 (The Rutter Group 1997). "Under the liberal federal system of notice pleading, all that a plaintiff must do in a complaint is give a defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Vector Research, Inc. v. Howard & Howard Attorneys P.C.,* 76 F.3d 692, 697 (6th Cir.1996) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957)).

Applying the notice pleading standards to the present case, the Court finds that, while somewhat inartfully pled and certainly not as comprehensively detailed as it might be, the Second Amended Complaint does contain sufficient allegations of a § 1 conspiracy among ARC's participating carriers to survive a motion to dismiss. In particular, paragraph 76 expressly places Defendants on notice that Plaintiff views ARC as a combination and conspiracy of its member air carriers:

Throughout the Class Period and continuing thereafter, Northwest and ARC (**which is, itself, a combination and conspiracy of airlines**) entered into a contract or agreement, or engaged in a conspiracy and/or combination in restraint of trade or commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the purpose and effect of which was to: (1) assist Northwest in fixing and maintaining prices for air passenger service originating from, or terminating at, its Hubs at supra-competitive, monopoly levels, and (b) unreasonably restrain trade.

[2nd Amend.Compl., ¶ 76 (emphasis added)].

In addition, Plaintiff supports this claim with numerous factual allegations regarding the structure of ARC. In particular, the Complaint includes allegations that ARC was created, and is controlled, by competing air carriers, many of whom are now stockholders and directors of the corporation. [2nd Amend.Compl, ¶ 6]. Finally, and most importantly, Plaintiff alleges that the structure of ARC allows its members to effectively pool their market power to exclude travel agents that refuse to comply with a member's ticketing policies:

[T]hrough various contracts and agreements, ARC has the authority to act on behalf of all its airline members collectively in determining who is qualified to act as a travel agent for ARC's airline members. **ARC's unilateral power to decide who is eligible to sell tickets for any of ARC's airline members (which constitutes virtually all of the airlines in the United States) concentrates in ARC's hands the combined power of all its members to effectively exclude a person or entity from working as a travel agent. This is a far greater exclusionary power than any of the airlines exercises alone. As discussed below, ARC uses its concentrated exclusionary power (which it derives from the various contracts and agreements discussed above) to aid its member airlines in enforcing their various rules and regulations against travel agents.**

[2nd Amend.Compl., ¶ 59, (emphasis added) ].

Thus, the Court reasonably reads the Second Amended Complaint to allege that competing carriers conspired through ARC to successfully implement Northwest's refusal to sell policy which, in turn, directly harms consumers by artificially inflating the prices that passengers pay for air travel originating or terminating at Northwest's hub airports. Such allegations are sufficient to state a valid claim under § 1 of the Sherman Act.

Having rejected ARC's sufficiency of the pleadings argument, the Court once again turns its attention to the intra-corporate conspiracy doctrine. The plaintiffs in *Nurse Midwifery, supra,* also alleged § 1 conspiracies by several pediatricians on one hospital staff and by several obstetricians on another hospital staff. In analyzing these claims, the Sixth Circuit first explained that unlike the hospital/medical staff conspiracy, "when competing physicians are making privilege recommendations concerning another competitor, sufficient anticompetitive concerns are raised" *to in some instances defeat application of the intra-corporate conspiracy doctrine. Nurse Midwifery,* 918 F.2d at 614. After noting that midwives compete with obstetricians, not pediatricians, the Court then proceeded to dismiss the alleged conspiracy among the pediatricians, but let stand the alleged conspiracy among obstetricians.

Although Dr. Shackleford is a competitor of the other pediatricians on the HCH medical staff, their actions regarding plaintiffs' application for privileges at HCH do not relate to the market in which they compete as individuals since NMA competes with obstetricians, not pediatricians. Accordingly, the intracorporate conspiracy doctrine also applies to this allegation.

*Id.* Thus, in order to avoid the intra-corporate conspiracy doctrine, an anti-trust plaintiff must show not only coordinated conduct among competitors, but also that the coordinated conduct furthers the competitive interests of the conspirators in the relevant market.

Arguing by analogy to the pediatricians in *Nurse Midwifery,* ARC argues that because its member airlines have no competitive interest in the success of Northwest's refusal to sell policy, the intra-corporate conspiracy doctrine applies.[17] To accept this argument at face value, however, would be to ignore the very nature of ARC's membership and structure and the interests of the other airline members. It is certainly possible—although uncertain at this early stage of the litigation due to the lack of record evidence—that ARC member airlines may have a substantial competitive interest in the success of Northwest's refusal to sell policy. Specifically, it is not inconceivable that other ARC member airlines accept Northwest's refusal to sell policy as part of a tacit agreement, implemented through ARC, to protect their own hub-and-spoke route systems and pricing policies. More specifically, in return for acquiescing in Northwest's refusal to sell policy, competing carriers may receive tacit consent to carry out their own anti-competitive ticketing policies, thereby ensuring that each airline reaps monopoly profits on routes originating or terminating at their own respective hub airports. The Court, of course, has no opinion as to whether such an arrangement will be borne out by discovery and admissible evidence, but such an agreement—implemented through ARC—is within a liberal reading of Plaintiff's Complaint, and in light of the fact that the Court may not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–102, the Court finds that the intra-corporate conspiracy doctrine does not preclude the alleged § 1 conspiracy among ARC's member airlines.[18]

## C. *Plaintiff's Section 2 Claim*

■ Plaintiff also contends that Northwest's refusal to sell policy will support a monopolization claim under § 2 of the Sherman Act, 15 U.S.C. § 2. In order to state a viable monopolization claim under § 2, an anti-trust plaintiff must allege: (1) the possession of monopoly power in the relevant market; and (2) the willful acquisition, maintenance, or use of that power either by anti-competitive or exclusionary means. *Directory Sales Management Corporation v. Ohio Bell Telephone Company,* 833 F.2d 606, 612 (6th Cir.1987) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 595, 105 S.Ct. 2847, 2854, 86 L.Ed.2d 467 (1985)). Section 2 requires both elements because the "mere possession of monopoly power is not illegal." *Byars v. Bluff City News Co., Inc.,* 609 F.2d 843, 853 (6th Cir.1979).

In their present motions, Defendants focus on the second element, arguing that Plaintiff has failed to allege any actionable anti-competitive conduct.[19] In support of this argument, Defendants' briefs go to great lengths to characterize Plaintiff's § 2 claim as (1) trying to deprive Northwest of

---

**17.** ARC claims that if it is "treated as a joint venture of other airlines, their competitive interest would be to *prevent* Northwest from achieving a monopoly, not to promote it." [Reply Brief, p. 9, emphasis in original].

**18.** Defendants also argue that an anti-trust plaintiff cannot state a valid claim under either 1 or § 2 of the Sherman Act by alleging only anti-competitive effects on intrabrand competition. For the reasons stated in detail in the discussion of Plaintiff's § 2 claim, the Court finds Defendants' argument without merit under the facts and circumstances as pled in this case.

**19.** For the purposes of their present motions only, Defendants concede that Plaintiff has adequately pled monopoly power in the relevant market, air routes originating or terminating at one of Northwest's hub airports.

its right to set prices for its own products; and (2) trying to require Northwest to compete with itself. In actuality, however, the anti-competitive conduct alleged by Plaintiff is Northwest's refusal to sell policy and the baggage check and ticket cancellation rules implemented to enforce the policy. More specifically, the Second Amended Complaint alleges that in order to maintain and protect its monopoly prices on hub routes, Northwest, with the assistance of ARC and travel agents, implemented a refusal to sell policy which deprives consumers of their ability to purchase cheaper spoke-hub-spoke tickets for spoke-hub routes. [2nd Amend.Compl., ¶ 87–89]. Plaintiff further alleges that the harm to consumers results directly from the refusal to sell policy's anti-competitive effects on intrabrand competition, in this case the reduction of competition (1) between Northwest and travel agents for the sale of air travel; and (2) between travel agents themselves for the sale of air travel. [2nd Amend.Compl., ¶ 55].[20] Thus, Plaintiff is not attacking Northwest's right to set prices for its own products, or arguing that Northwest must compete against itself. Rather, the essence of Plaintiff's § 2 claim is that Northwest has enacted an anti-competitive barrier—the refusal to sell policy—which interferes with how the relevant market would operate in the absence of such a policy.

While on the surface such allegations would appear to suffice, Defendants argue that allegations of anti-competitive effects on intrabrand competition alone will not support a claim under § 2. Along these lines, Defendants assert that Plaintiff must also allege some negative effect on interbrand competition resulting from the refusal to sell policy. In making this argument, Plaintiff relies on a series of § 1 "jilted distributor" cases. *See, Crane & Shovel Sales Corporation v. Bucyrus–Erie Co.*, 854 F.2d 802, 806 (6th Cir.1988) ("We have consistently held that a complaint which simply alleges that a manufacturer substituted one distributor for another fails to state a violation of the rule of reason, unless it also alleges anti-competitive effect at the interbrand level."); *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*, 129 F.3d 240, 245 (2nd Cir.1997) ("Nor is it a violation of the antitrust laws, without a showing of an actual adverse effect on competition market-wide, for a manufacturer to terminate a distributor.").[21] A close examination of the typical jilted distributor cases, however, reveals that they rest on facts and circumstances substantially distinguishable from the present case.

For example, in *Crane & Shovel Sales Corporation*, Plaintiff Crane, a former dealer of Bucyrus Construction Products ("BCP"), brought suit under § 1 of the Sherman Act alleging that the manufacturer had illegally conspired to terminate and replace Crane and other similarly situated distributors with GPS Equipment Corporation as an exclusive territorial dealer. Defendants filed a 12(b)(6) motion to dismiss, which the District Court granted on the grounds that Crane had failed to allege any anti-competitive effect on interbrand competition. In affirming the District Court decision, the Sixth Circuit focused

---

**20.** The Supreme Court has explained the distinction between interbrand and intrabrand competition as follows:

Interbrand competition is the competition among the manufacturers of the same generic product—television sets in this case—and is the primary concern of antitrust law. The extreme example of a deficiency of interbrand competition is monopoly, where there is only one manufacturer. In contrast, intrabrand competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer.

*Crane & Shovel Sales Corporation v. Bucyrus–Erie Co.*, 854 F.2d 802 (6th Cir.1988) (quoting *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 52 n. 19, 97 S.Ct. 2549, 2558 n. 19, 53 L.Ed.2d 568 (1977)).

**21.** Defendants provided the Court with a copy of the Second Circuit's decision in the *Electronics Communications* case at oral argument.

its inquiry on whether the net effect of the change in the manufacturer's distribution scheme benefitted or harmed consumers.

> Crane, however, overlooks the possibility that the decision to award GPS exclusive distributorship rights may increase BCP's ability to compete with other brands of construction machinery parts, and thus, far from violating the Sherman Anti–Trust Act, would indeed further one of its major purposes, the promotion of interbrand competition to the ultimate benefit of consumers. [E]ven though refusals to deal limit intrabrand competition, they are likely to benefit consumers by increasing interbrand rivalry

*Crane & Shovel,* 854 F.2d at 810 (internal citations and quotations omitted). Thus, because the pro-competitive effects to consumers on interbrand competition likely outweigh any negative effects to consumers on intrabrand competition in jilted distributor cases, the Sixth Circuit required an allegation of anti-competitive effect at the interbrand level. *See also, Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 297 (5th Cir.1981) ("a supplier's termination of a distributor or dealer is not a violation of the antitrust laws as long as interbrand competition acts as a 'significant check on the exploitation of intrabrand market power.' " (quoting *Continental T.V.,* 433 U.S. at 53, n. 19, 97 S.Ct. at 2559 n. 19)).

The allegations in the instant action, however, stand in sharp contrast to the typical jilted distributor case. In particular, Plaintiff alleges that there is no substantial interbrand competition in the relevant market—routes originating or terminating at Northwest's hub airports—to act as a check on Northwest's exploitation of its intrabrand market power. In the absence of interbrand competition, intrabrand competition may provide the only significant source of consumer welfare to passengers originating or terminating their travel at Northwest's hub airports. As explained by the Eleventh Circuit:

> The argument, pressed by [defendant] at length here, that the reduction or elimination of intrabrand competition is, by itself, never sufficient to show that a trade restraint is anti-competitive must rest, at bottom, on the view that intrabrand competition—regardless of the circumstances—is never a significant source of consumer welfare. This view is simply not supported by economic analysis, or by the cases. A seller with considerable market power in the interbrand market—whether stemming from its dominant position in the market structure or from the successful differentiation of its products—will necessarily have some power over price. In that situation, intrabrand competition will be a significant source of consumer welfare because it alone can exert downward pressure on the retail price at which the good is sold.

*Graphic Products Distributors, Inc. v. Itek Corporation,* 717 F.2d 1560, 1572 n. 20 (11th Cir.1983). Recognizing the aforementioned principle, the *Itek* Court, as explained in detail below, affirmed the viability of a § 1 Sherman Act claim based solely on alleged anti-competitive effects on intrabrand competition.

The *Itek* case involved an anti-trust suit by Graphic Products Distributors, Inc. ("GPD"), a former exclusive distributor of Itek graphic equipment and supplies for seven areas in Georgia and South Carolina. Itek utilized a dual distributorship system, which permitted the company's branch offices to make direct sales within a 50 mile radius of the major urban areas in which they were located. Areas not covered through direct sales by branch offices were allotted to exclusive distributors such as GPD. When Itek terminated GPD's distributorship agreement for making sales within the territory of Itek's Atlanta branch office, GPD filed suit under § 1 of the Sherman Act alleging, *inter alia,* that Itek's exclusive distribution scheme illegally restrained intrabrand competition in the national platemaker market over which

Itek maintained 70 to 75 percent market share. After a jury returned a verdict in favor of Itek, the district court denied the company's motion for judgment n.o.v. and, alternatively, for new trial.

On appeal, Itek argued that GPD had failed to provide sufficient evidence of an anti-competitive effect in the relevant interbrand market. Relying on the Supreme Court's decision in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), the Eleventh Circuit enumerated a three-prong framework for analyzing GPD's claim which focused on the net effect of Itek's distribution scheme on both the interbrand and intrabrand market. As an initial matter, the Court found that GPD needed to establish the market power of Itek in the relevant market for platemakers. *Itek*, 717 F.2d at 1568. Having satisfied this threshold, GPD was required to " 'show [an] anti-competitive effect, either in the intrabrand or interbrand markets.' " [22] *Id.* at 1571 (quoting *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 246 (5th Cir.1978)). Finally, the Court noted that "even if a negative effect on consumer welfare and competition can be shown to flow from a restriction of intrabrand competition, the court must still look to any possible pro-competitive effects on the interbrand mar-

ket stemming from the intrabrand restriction." [23] *Id.* at 1572–1573.

Applying the aforementioned analytical framework to the case at hand, the Eleventh Circuit then reached the following conclusion:

> From this conflicting evidence, we cannot say that the facts and inferences pointed so strongly in the direction of a finding that Itek's restraints were pro-competitive in purpose and effect that reasonable persons could not have arrived at a contrary verdict. Nor can we say that, having passed the threshold of proving Itek's market power, GPD failed to produce substantial, probative evidence to support the jury's finding that the restraint had substantially adverse effects on competition, which competition was an important source of consumer welfare. We must therefore, affirm the district court's refusal to grant Itek's judgment n.o.v. motion on the issue of liability.

*Id.* at 1578.

Returning to the instant case, the Court finds Plaintiff's § 2 claim sufficiently analogous to *Itek* to survive a 12(b)(6) motion to dismiss. The Second Amended Complaint expressly alleges that Northwest has a dominant market position in the relevant interbrand market—air routes

---

**22.** In enumerating this requirement, the Eleventh Circuit commented:

> A restriction of intrabrand competition may—depending on the interbrand market structure—either enhance or diminish overall competition, and hence consumer welfare. As one commentator puts it, 'the real issue remains whether the loss of intrabrand competition itself injures or benefits potential consumers of the brand in question. Those consumers are injured by the restraint if, without obtaining more services, they are denied intrabrand choices that are sources of consumer welfare, but are benefitted [notwithstanding the restraint] if dealer services increase.' *Gerhart, The 'Competitive Advantages' Explanation For Intrabrand Restraints: An Antitrust Analysis, 1981 Duke L.J. 417, 439.* Moreover, if enhanced dealer services to the con-

sumer result from the restraint, intrabrand competition should be sharpened. *Itek*, 717 F.2d at 1571–1572.

**23.** While noting that the burden was on GPD to show that the restraint in question was "substantially adverse to market competition," the Eleventh Circuit expressly stated that "Itek was free to come forward with a showing that, notwithstanding its market power, the vertical restraints were reasonably necessary to achieve legitimate, pro-competitive purposes, and that the purpose and effect of the restraints were pro-competitive when viewed as a whole." 717 F.2d at 1573. At trial, Itek offered two pro-competitive justifications for its territorial restraints: (1) to provide adequate servicing for its equipment to customers in outlying areas; and (2) to enhance market penetration. *Id.* at 1577–1578.

originating or terminating at one of Northwest's hub airports, a point which, for the purposes of the present motions, Defendants do not contest. Plaintiff further contends that Northwest took steps to illegally maintain its monopoly power by enacting a barrier, the refusal to sell policy, that restricted competition among the various distributors of Northwest tickets by prohibiting them from offering other, less expensive Northwest ticket alternatives. This alleged anti-competitive effect on intrabrand competition purportedly harmed consumers by artificially inflating the price that passengers pay for air travel in and out of Northwest's hub airports.

In sum, Plaintiff alleges that in order to maintain its monopoly power over air routes originating or terminating at its hub airports, Northwest enacted an anti-competitive market barrier, the refusal to sell policy, which directly harmed consumers by reducing intrabrand competition. Moreover, Defendants have offered no countervailing pro-competitive effects of the refusal to sell policy which, on their face, would justify a dismissal of Plaintiff's claims. Accordingly, under the facts and circumstances of this case, where intrabrand competition may provide the only significant source of consumer welfare in the relevant market, the Court finds Plaintiff's allegations of anti-competitive effects at the intrabrand level sufficient to support a valid claim under § 2 of the Sherman Act.

## IV. CONCLUSION

For all of the aforementioned reasons:

IT IS HEREBY ORDERED that Defendants' Motions to Dismiss are GRANTED with respect to the alleged § 1 conspiracies between: (1) Northwest and the non-defendant travel agents; and (2) Northwest and ARC itself.

IT IS FURTHER ORDERED that Defendants' Motions to Dismiss are DENIED with respect to the alleged § 1 conspiracy among ARC's participating carriers, and with respect to Plaintiff's

§ 2 monopolization claim against Northwest.