Ramon **LERMA** d/b/a **Blue Screen Advertising, Robert Monteagudo, Delta Morales, Mario Omar** d/b/a **Biei Advertising, Yvette Velasquez** d/b/a **Mufflers for Less,** and **W46AR Channel 46,** Plaintiffs,

v.

**UNIVISION COMMUNICATIONS, INC.,** Defendant.

No. 99–C–447.

United States District Court, E.D. Wisconsin.

June 11, 1999.

Scott W. Hansen, Milwaukee, WI, for Plaintiffs.

Thomas L. Shriner, Milwaukee, WI, for Defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

Issues of fraudulent joinder and antitrust coalesce in this case involving the decision of the sole provider of Spanish-language television programming in the Milwaukee area to switch from over-the-air broadcasting to a direct cable feed.

### I. PROCEDURAL HISTORY

Plaintiffs filed this lawsuit and a motion for a temporary restraining order on Wednesday, April 28, 1999, seeking to prevent defendant Univision Communications, Inc. from terminating plaintiff W46AR Channel 46's over-the-air broadcast of Univision's Spanish-language network programming. Channel 46's contractual right to broadcast

Univision programming was due to expire on April 30.

Plaintiffs filed the case in Milwaukee County Circuit Court and waited in the courtroom of the assigned judge, Lee Wells,[1] for an opportunity to address the TRO request. When the case was called, Judge Wells telephoned defendant's general counsel, located in Los Angeles, California, who then conferenced in outside counsel, also located in California. The court and parties discussed the matter and then scheduled an expedited hearing for the next day, Thursday, April 29, at 2:00 p.m. At the end of the telephone conference, however, Judge Wells stated as follows:

Here's what I'm going to do, though, so that the status quo is retained until we have our hearing tomorrow, and that is as follows:

That is, I am verbally ordering that the status quo procedure remain now and intact until such time as at the conclusion of tomorrow's hearing, at which time I'll take some action one way or the other, and that is that Channel 46 must remain in business. They must continue to be able to transmit programming through—provided by Univision in the same manner that they are right now, not being on cable but being regular television programming without Cable TV, and that will be the order at least until tomorrow until I can make some decision on what I hear tomorrow; and tomorrow I'll make a new order one way or the other, one way on this aspect as well as the other aspects requested by the plaintiff or the defendant or both.

(Tr. of 4/28/99 at 36.) Upon an objection by Univision's attorneys because the "order is unnecessary ... because the contract doesn't expire until the 30th," the judge indicated: "I know. But the reason I'm doing this is I wouldn't want somebody down there in your office to haphazardly decide to cancel tomorrow and, therefore, claim we're not retaining the status quo;

and that's why I'm doing it to protect the status quo." (*Id.* at 36–37.)

At 1:23 p.m. the next day, Univision removed the case to federal court, where it was assigned to me. Counsel for Univision attended the state court's hearing at 2:00 p.m. but made no formal appearance, instead informing Judge Wells of the removal. Noting that removal prevented him from doing anything further in the case, Judge Wells nevertheless noted that

because of ... the needs of the community to have the benefit of ongoing free television for Hispanics and Latinos in this community, I did order a temporary restraining order on the record, and that order remains intact and in place until there's further order of this Court. Since I cannot make further order of this Court, it remains intact unless otherwise changed or altered or removed by some other Court of appropriate jurisdiction.

(Tr. of 4/29/99 at 4–5.)

On Friday, April 30, my chambers contacted the parties' attorneys to arrange a TRO hearing and further proceedings in the case. Also on April 30, plaintiffs filed a motion to remand the case to state court. Upon the setting of an in-person status conference for the following Tuesday, May 4, Univision's counsel questioned the validity of Judge Wells's order but agreed to abide by it until the status conference could be held.

Defendants removed this case under 28 U.S.C. § 1332 based on diversity jurisdiction. It is undisputed that more than $75,000 is involved. But according to the complaint and notice of removal, plaintiffs Ramon Lerma and Mario Omar are citizens of California, and defendant Univision Communications, Inc. has its principal place of business in California. Lerma, Omar and Univision thus are citizens of the same state, which ordinarily defeats federal court subject matter jurisdiction.

---

1. Actually, Judge Michael Malmstadt was assigned the case, but was unavailable at the time the case was filed. Judge Wells was Judge Malmstadt's substitute that day.

*Hoosier Energy Rural Elec. Co-op., Inc. v. Amoco Tax Leasing IV Corp.,* 34 F.3d 1310, 1314–15 (7th Cir.1994) (diversity must be "complete," meaning that no plaintiff may be a citizen of the same state as any defendant). Whether the case should remain in this court therefore was a serious question.

At the May 4 status conference I indicated that I would address the motion to remand before dealing with the TRO because of my belief that in the absence of federal subject matter jurisdiction, the decision on the TRO should be handled by the state court. The parties agreed to a briefing schedule for the remand motion and Univision agreed to continue supplying Channel 46 with broadcasting until I could issue a decision. On May·24, 1999, I heard oral argument on the remand motion.

Since then Univision filed a motion to dismiss. Plaintiffs in turn moved to stay briefing on and consideration of the motion to dismiss until the remand issue is decided.

## II. FRAUDULENT JOINDER

■ While diversity ordinarily must be complete for federal court subject matter jurisdiction to exist, plaintiff cannot avoid diversity jurisdiction by fraudulently joining nondiverse parties. *Id.* at 1315. Thus, if Univision can show that the joinder of Lerma and Omar was fraudulent, as it alleged in its notice of removal, removal will nevertheless be allowed. *See Wilson v. Republic Iron & Steel Co.,* 257 U.S. 92, 97, 42 S.Ct. 35, 66 L.Ed. 144 (1921); *Poulos v. Naas Foods, Inc.,* 959 F.2d 69, 73 (7th Cir.1992).

■ Joinder is fraudulent when there are false allegations of jurisdictional fact, or more commonly and as is alleged here, when the claim against the nondiverse defendant has no possible chance of success in state court. *Hoosier Energy,* 34 F.3d at 1315. Even though plaintiffs filed the motion to remand, the removing party bears the burden of proving fraudulent joinder, *see Wilson,* 257 U.S. at 97, 42 S.Ct. 35, and

the burden is a heavy one. The removing party must show that, after resolving all issues of fact and law in favor of the plaintiffs, the nondiverse plaintiffs cannot establish a cause of action against the defendant. *Poulos,* 959 F.2d at 73. If there is any. reasonable possibility that a state court would rule against the nondiverse defendant, then joinder is not fraudulent. *Id.* If there is any doubt as to the right of removal, ambiguities are to be resolved against removal. *Tom's Quality Mill-work. Inc. v. Delle Vedove USA, Inc.,* 10 F.Supp.2d 1042, 1044 (E.D.Wis.1998).

■ When analyzing whether Lerma and Omar can establish a cause of action against Univision I look at the allegations in the complaint. *See Poulos,* 959 F.2d at 74 ("only present allegations count"); *Lynch Ford. Inc. v. Ford Motor Co.,* 934 F.Supp. 1005, 1007 (1996) (where plaintiff alleged additional facts in support of its theory in motion to remand, "[t]hose factual allegations will be ignored .... [T]he Court's inquiry is limited to the factual assertions of [the] complaint."). Jurisdiction depends on the situation at the time of removal. *Id.*

As a result, I must analyze the claims made by Lerma and Omar as pled in the complaint to determine whether there is a reasonable possibility that Lerma and Omar could prevail. The inquiry is similar to an analysis under Federal Rule of Civil Procedure 12(b)(6).

## III. THE MONOPOLIZATION CLAIM

### A. General Allegations in the Complaint

According to the complaint, Univision is the largest and most dominant Spanish-language broadcast network in the United States, with 90 percent of the national market for Spanish-language television and 100 percent of the Milwaukee area market. (Compl. ¶¶ 1 & 12.) The only other Spanish-language broadcast network in the country, Telemundo, has no presence in Milwaukee. (Compl. ¶ 15.)

For over nine years Univision has broadcast its programming in the Milwaukee area over W46AR Channel 46, which supplies the Milwaukee area with free, over-the-air broadcasting. (Compl.¶ 1.) Channel 46 is the only station in the Milwaukee area that currently broadcasts Spanish-language programming. (Compl.¶ 5.) Univision now plans to withdraw its programming from Channel 46 and make it available only through cable television. (Compl.¶ 3.) Univision's switch to a direct-feed on cable thus will deprive persons in the Milwaukee area of the free broadcast of any Spanish-language programming. (Compl.¶ 16.)

More than half of the 19,000 Milwaukee area Hispanic households currently do not have cable television. (Compl. ¶¶ 2 & 13.) Many of these households depend exclusively or primarily upon Spanish-language television programming for news, entertainment, sports, and other local and national information. Most of these families—those who do not or cannot purchase cable packages—have access to Univision's programming only through Channel 46. (Compl.¶ 14.) [2]

Plaintiff Ramon Lerma is a California resident who runs an advertising agency called Blue Screen Advertising. Plaintiff Mario Omar owns an advertising agency located in California, called BIEI Advertising. Both Blue Screen and BIEI buy and sell advertising time for broadcast in Hispanic communities. (Compl. ¶¶ 9 & 10.) Blue Screen and BIEI need access to local advertising time to reach Hispanic communities within certain areas. Blue Screen purchases advertising time from Channel 46. (Compl.¶ 11.)

. In regard to the claims of Lerma and Omar, the complaint asserts that because of Univision's switch to cable television in the Milwaukee area, advertisers who currently run advertising on Channel 46 and who would in the future purchase advertising slots on Univision's cable broadcasts "will be foreclosed from reaching any Hispanic households which do not, or cannot, purchase cable television packages." (Compl.¶ 19.) Further, advertisers also will be subject to higher rates after Univision's switch, as the amount of advertising minutes available to local advertisers will decrease substantially and the price will rise as available minutes become more scarce and the local advertisers have no viable substitutes or alternatives for broadcasting their advertisements. (Compl.¶ 20.)

**B. Lerma's and Omar's Legal Claims**

As set forth in the complaint Lerma and Omar sue Univision under Wisconsin's antitrust law for monopolization and attempted monopolization, Wis.Stat. § 133.03(2).[3] This statute was intended as a reenactment of § 2 of the federal Sherman Antitrust Act, 15 U.S.C. § 2,[4] with application to anticompetitive activity having an impact in Wisconsin. *See Emergency One, Inc. v. Waterous Co., Inc.*, 23

2. From what counsel indicated at the status conference I held on May 4 and as discussed in Univision's brief on the remand motion—and from what is plainly visible on Milwaukee area cable itself—Channel 46's signal presently is rebroadcast on cable. Thus, cable watchers currently may view Univision programming as part of their cable packages.

3. Wisconsin Statute § 133.02(3) reads:

Every person who monopolizes, or attempts to monopolize, or combines or conspires with any other person or persons to monopolize any part of trade or commerce may be fined not more than $100,000 if a corporation, or, if any other person, may be

fined not more than $50,000 or imprisoned for not more than 7 years and 6 months or both.

4. Section 2 states:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any ·other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

F.Supp.2d 959 (E.D.Wis.1998). Wisconsin courts have held that the state version is generally controlled by federal court decisions regarding the Sherman Act. *See Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.,* 190 Wis.2d 650, 665, 529 N.W.2d 905 (1995); *American Med. Transport of Wisconsin, Inc. v. Curtis–Universal, Inc.,* 148 Wis.2d 294, 299, 435 N.W.2d 286 (Ct.App.1988), *rev'd on other grounds,* 154 Wis.2d 135, 452 N.W.2d 575 (1990). The purpose of such antitrust laws is to preserve the health of the competitive process. *Brunswick Corp. v. Riegel Textile Corp.,* 752 F.2d 261, 266 (7th Cir.1984).

■ There are two elements to a monopolization claim under § 2 of the Sherman Act, and thus under Wis.Stat. § 133.03(2):(1) the defendant's possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power by anticompetitive or exclusionary means. *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)); *Chase v. Northwest Airlines Corp.,* 49 F.Supp.2d 553, 565–66 (E.D.Mich.1999); *American Med.,* 148 Wis.2d at 301, 435 N.W.2d 286; *see Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 595, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). Although not a specifically-stated element of a monopolization claim, in order for any particular plaintiff to pursue an antitrust claim, he or she also must assert personal antitrust injury. *Brunswick Corp. v. Pueblo Bowl–O–Mat. Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

For purposes of the current motion, Univision does not deny that it has a mo-

nopoly in the "relevant market." The possession of monopoly power depends on a defendant's market power regarding a "product market" within a "geographic market." Irving Scher, *Antitrust Adviser* § 1.22 (4th ed.1998). The complaint asserts that the Milwaukee area constitutes the geographic market and that Spanish-language programming constitutes the product market for antitrust purposes. (Compl.¶ 27.) I assume for present purposes that these allegations are true and sufficient for asserting the first element of a monopolization claim.

Univision, however, vigorously challenges plaintiffs on the second element. Univision asserts that its planned action—switching to cable—does not and will not constitute anticompetitive or exclusionary conduct. It also contests whether the two California plaintiffs can establish, under the facts of the complaint, any antitrust injury allowing them to bring the antitrust claims.[5] I will address the two issues in reverse order.

## C. Antitrust Injury

■ Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Pueblo Bowl–O–Mat,* 429 U.S. at 489, 97 S.Ct. 690. The antitrust injury requirement ensures that a plaintiff can recover only if his or her loss stems from a competition-reducing aspect or effect of the defendant's behavior. *Atlantic Richfield Co. v. USA Petroleum Co.,*

---

**5.** While I have set forth the elements of only the monopolization claim, the requirements of anticompetitive conduct and antitrust injury apply to plaintiffs' attempted monopolization claim as well. *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (attempted monopolization requires (1) predatory or anticompetitive conduct, (2) specific intent to mo-

nopolize, and (3) a dangerous probability of achieving monopoly power); *Olympia Equip. Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 373 (7th Cir.1986) ("Conduct lawful for a monopolist is lawful for a firm attempting to become a monopolist."). Therefore, if the monopolization claim fails on these points, the attempt claim fails too.

495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

For argument's sake, I assume for the moment that Univision's switch from supplying Channel 46 with its programming for over-the-air broadcast to supplying such programming to the Milwaukee cable operator can be considered anticompetitive behavior. Also, I note at the outset that while my decision regarding remand does not turn on this (as there are two California plaintiffs), the facts alleged in the complaint support no finding of antitrust injury whatsoever to Omar. The extent of the allegations specifically mentioning Omar are in total, as follows: "Plaintiff Mario Omar also owns and runs his own advertising agency, BIEI Advertising, located at ... Marina del Rey, CA 90292. Biei Advertising also buys and sells advertising time for broadcast to. Hispanic communities." (Compl.¶ 10.) In contrast to the allegations about Lerma's business, regarding which the complaint states that "Blue Screen purchases advertising time from Channel 46 because it is the best way to reach consumers within the Hispanic community in the Milwaukee Metropolitan area," (*id.* ¶ 11), no allegation is made that Omar or BIEI Advertising ever arranged for advertising on Channel 46 or in the Milwaukee area. (At oral argument counsel indicated that such an allegation was made regarding Omar, but I have not found it in the complaint.) As a result, Omar asserts no injury related to Univision's actions regarding the relevant product in the relevant geographic area.

In arguing the issue of antitrust injury, Univision tries to shift the focus from Lerma's claims to those asserted by Channel 46, the distributor being replaced. But for present purposes I must look at the claims of Lerma, as a purchaser of local-only advertising time. While Univision is correct that "[t]he antitrust laws were enacted for the protection of competition, not competitors," *Atlantic Richfield*, 495 U.S. at 338, 110 S.Ct. 1884 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)), Lerma is not alleged to be a competitor of

Univision. As a consumer or purchaser of advertising time, Lerma is an indirect customer of Univision, not a competitor.

■ As alleged in the complaint, Lerma himself will face higher prices and lower availability of advertising time if Univision switches to cable. If Univision changes to a direct-feed to cable, a chunk of its advertising time now devoted to local advertising will be replaced by nationwide advertising. There is no other Spanish-language broadcasting in Milwaukee to which Hispanic-targeted local advertisers can turn and there are only so many available minutes of advertising during Univision programs. If advertising minutes available to local advertising purchasers, which Lerma is asserted to be, are fewer, Univision's local advertising "output" will be lower. Further, if, as Lerma alleges, prices for local advertising will rise as the supply of local advertising minutes decreases, consumers like Lerma also will pay more.

Higher prices and lower output from the consumer's perspective are the principal vices prescribed by the antitrust laws. *See Nelson v. Monroe Regional Medical Center*, 925 F.2d 1555, 1562 (7th Cir.1991). In *Caribbean Broadcasting System, Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1087 (D.C.Cir.1998), the D.C. Circuit found antitrust injury in a broadcaster's charging of excessive prices for advertising related to the broadcaster's unlawful monopolistic actions. The court indicated that "[p]laying higher prices is certainly a direct harm to customers.... [I]t appears that antitrust injury to [plaintiff] CBS is ultimately a harm to U.S. purchasers of radio advertising. By keeping CBS out of the market, [defendants] CCC and C & W denied such purchasers the benefit of competition." *Caribbean Broadcasting*, 148 F.3d at 1087. In the present case, Lerma is a similar purchaser of television advertising, and is similarly harmed by Univision's alleged monopolistic practices that reduce competition in the market.

Lerma is also like Shearin Inc., a plaintiff in *Community Publishers, Inc. v. DR Partners,* 139 F.3d 1180 (8th Cir.1998). This recent case concerned the acquisition of one local daily newspaper by the owner of the other leading local daily newspaper. The Eighth Circuit upheld a finding of a threat of antitrust injury based upon Shearin's status as a purchaser of advertising in one of the papers:

Shearing alleged that a combination of the Times and the Morning News would raise advertising rates as a result of the two newspapers' dominant market position. The threat of higher prices resulting from dominant market power being a primary concern of Section 7 [of the Clayton Act, 15 U.S.C. § 18], the District Court correctly determined that Shearin had shown antitrust injury.

*Id.* at 1183.

In its brief, Univision argued that plaintiffs' economics are all wrong because Channel 46 itself has been a monopolist and therefore already should be capturing monopoly advertising rates. Changing who holds the monopoly will have no effect, says Univision. Univision may be correct. But plaintiffs' theory—based on the well-known doctrine of "supply and demand"—is not wholly implausible, and thus there is a reasonable possibility that Lerma will be harmed by Univision's switch to cable. Even Univision conceded at oral argument that, based on the above cases, advertisers like Lerma could in theory suffer antitrust injury if the available slots for advertising go down and/or the prices of advertising go up as a result of anticompetitive conduct.

The assumption I made above regarding anticompetitive conduct is extremely important, however, for purposes of antitrust injury. As stated above, antitrust injury arises only when a private party is adversely affected by an anticompetitive aspect of the defendant's conduct. *See Atlantic Richfield,* 495 U.S. at 339, 110 S.Ct. 1884. Lerma must show an injury to him resulting from Univision's *illegal* conduct. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). This means that Lerma must allege not only an injury to himself, but an injury to the market as well. *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984). While I find that the complaint adequately alleges some injury to Lerma from Univision's switch to cable, it remains to be seen whether Univision's switch to cable is anticompetitive conduct and thus whether Lerma's injury is antitrust injury.

## D. Anticompetitive Conduct

As stated above, the second element of a monopolization claims is acquisition or maintenance of monopoly power through anticompetitive or exclusionary means. Commentators have noted that this element, as stated, is a vague one. *See* Scher, *supra,* § 1.27 ("The issue of the kind of conduct that fulfills this requirement has perplexed courts ever since Judge Learned· Hand stated in *Alcoa* [*United States v. Aluminum Co. of America,* 148 F.2d 416, 432 (2d Cir.1945) ] more than 50 years ago that willfully monopolistic conduct can be found without a showing of 'specific' intent to monopolize."); Kenneth L. Glazer & Abbott B. Lipsky, Jr., *Unilateral Refusals to Deal Under Section 2 of the Sherman Act,* 63 Antitrust L.J. 749 (1995) ("Courts have long struggled to define the specific forms of business conduct that constitute monopolization under Section 2 of the Sherman Act."). Anticompetitive conduct has been said to "come in too many different forms, and [be] too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broadcasting,* 148 F.3d at 1087.

Some general principles provide some guidance, often focusing on what does not constitute unlawful conduct. The Supreme Court has indicated that neither growth or development as a consequence of a superior product, nor business acumen, nor historic accident can be considered illegal. *Kodak,* 504 U.S. at 481, 112 S.Ct. 2072

(quoting *Grinnell*, 384 U.S. at 570–71, 86 S.Ct. 1698); *see American Med.*, 148 Wis.2d at 301, 435 N.W.2d 286. And conduct will not be condemned "when it is determined that it constituted no more than aggressive competition or the rigorous pursuit of legitimate business objectives." Scher, *supra*, § 1,27. Monopoly power does not itself constitute unlawful monopolization. "Not the possession, but the abuse, of monopoly power violates section 2 [of the Sherman Act]," *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, (7th Cir. 1986), and thus Wis.Stat. § 133.03(2). "The mere existence of the power to control prices or exclude competition is not unlawful unless it is coupled with an element of deliberateness (conduct Intended to use or preserve such power)." Scher, *supra*, § 1.21 (citing *Grinnell* and other Supreme Court cases).

One stated test of anticompetitive conduct, however, is whether monopoly power is used to foreclose competition, gain a competitive advantage, or destroy a competitor. *Kodak*, 504 U.S. at 482–83, 112 S.Ct. 2072. Courts should consider whether the conduct "has impaired competition in an unnecessarily restrictive way." *Aspen Skiing*, 472 U.S. at 605, 105 S.Ct. 2847. Anticompetitive or exclusionary conduct "impairs the opportunities of rivals and is neither 'competition on the merits' nor more restrictive than reasonably necessary for such competition. The definition is objective and does not depend, in any ordinary sense, on the purpose, intent, or willfulness of the defendant or on the non-inevitability of its action." III Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 650a (rev. ed.1996). Courts should ask

> whether the underlying purpose of the firm's conduct was to enable the firm to compete more effectively. Did the firm engage in the challenged conduct for a legitimate business reason? Or was the firm's conduct designed solely to insulate the firm from competitive pressure? ... When courts speak of a firm's intent in a monopolization case, they refer to

the legitimacy of the firm's conduct as measured by its intended effect on the competitive process.... Conduct that tends to exclude competitors may therefore survive antitrust scrutiny if the exclusion is the product of a "normal business purpose"....

*State of Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d 1469, 1481 (7th Cir.1991). Whether valid business reasons motivated a monopolist's conduct generally is a question of fact. *Id.*

Monopolization cases involve a wide variety of challenged conduct, falling into categories such as "monopoly leveraging," which is the use of monopoly power in one market to obtain a competitive advantage in a second market; predatory pricing; and refusals to deal. Scher, *supra*, §§ 1.27–1.30. Through its references, especially at oral argument, to such cases as *Aspen Skiing*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467; *Byars v. Bluff City News Co.*, 609 F.2d 843 (6th Cir.1979); and *Chase*, 49 F.Supp.2d 553, plaintiffs construe their antitrust claims as the refusal to deal type.

Monopoly cases also sometimes are separated based on whether the monopolist is the single entity in a market or whether, even though the defendant is a monopoly, other competitors exist. Many of the single-entity market cases involve natural monopolies, which exist in markets where the entire demand can be satisfied at lowest cost by one producer. *See* Neil W. Hamilton & Anne M. Caulfield, *The Defense of Natural Monopoly in Sherman Act Monopolization Cases*, 33 DePaul L.Rev. 465, 465 (1984); Richard A. Posner, *Natural Monopoly and Its Regulation*, 21 Stan.L.Rev. 548, 548 (1969). No allegations in the complaint assert that Univision has a natural monopoly. Nevertheless, it is undisputed that Univision is the only Spanish-language program provider in town.

Plaintiffs allege that three different anticompetitive effects will occur after Univision's planned switch to a direct cable

feed, all of which, they say, should be added together to assess whether anticompetitive conduct has occurred: (1) higher advertising rates for advertisers like Lerma, (2) the charging of a fee for cable to viewers currently receiving Univision broadcasting over-the-air, and (3) entry barriers for Telemundo.

### 1. Higher Prices and Reduced Supply for Lerma and Viewers

■ The fact that Lerma, as alleged in the complaint, will face a lower supply and thus higher prices for an advertising slot following Univision's switch to cable does not itself equal anticompetitive conduct; the same is true of the result that Univision's viewers are to be charged a price in order to obtain its programming. "[T]he antitrust laws are not a price-control statute or a public-utility or common-carrier rate-regulation statute." *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir.1995). A monopolist has no duty to reduce its prices or keep them low in order to help consumers. *Olympia*, 797 F.2d at 376. When the defendant is a legal monopolist—and plaintiffs do not claim that Univision is otherwise—insofar as a plaintiff pays high prices because the defendant is a monopolist, the plaintiff's claim must fail; "a lawful monopolist can charge what it wants." *Blue Cross*, 65 F.3d at 1415. "Provided it does not engage in any unlawful exclusionary practice, a monopolist is entitled to charge whatever price the market will bear." *Areeda, supra,* ¶ 657c1.

A monopolist's raising of prices, in fact, is a *pro* competitive act. The higher a monopolist's prices, the greater the opening for competitors. *Blue Cross*, 65 F.3d at 1415. It is "an attracting rather than an excluding practice." *Id.* at 1413; *see Matsushita*, 475 U.S. at 583, 106 S.Ct. 1348 ("respondents stand to gain from any conspiracy to raise the market price"). The same is true for a monopolist's limiting of output. *See id.* (limitation of distribution in United States by Japanese firms cannot create cognizable claim for antitrust damages).

### 2. Refusal to Deal

Plaintiffs argue that Univision's conduct is anticompetitive because Univision refuses to deal. The refusal to deal category originated in dictum in *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919), where the Supreme Court declared:

> In the absence of any purpose to create or maintain a monopoly, the [Sherman Act] does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and of course, he may announce in advance the circumstances under which he will refuse to sell.

The Sixth Circuit has labeled the question "under what circumstances does a monopolist have a duty to deal?" as "one of the most unsettled and vexatious in the antitrust field." *Byars*, 609 F.2d at 846.

The most easily spotted refusal to deal is Univision's decision to terminate its contract with Channel 46. The fact that Univision is changing distributors of its product does not constitute anticompetitive conduct, though. Suppliers should have the discretion to structure their own distribution. Glazer, *supra*, at 787. As Judge Easterbrook suggested in *Premier Electrical Construction Co. v. National Electrical Contractors Association, Inc.*, 814 F.2d 358, 369 (7th Cir.1987):

> [I]n selecting a method of distribution, manufacturers act in the consumers' interest. Neither wants a higher markup unless that is beneficial to purchasers. If the manufacturer adopts a restricted distribution policy in order to serve its own interests, therefore, there is no reason to doubt that the policy is beneficial to consumers and consistent with the purposes of antitrust law. Perhaps a given manufacturer is mistaken, but if so the reaction of consumers (and the lower profits) will send the message faster than courts could.

It is not anticompetitive conduct for a party, even a monopolist, to terminate an at-will contract with one dealer (assuming, for present purposes, that is what Channel 46 is) and enter into a similar contract with another dealer. *See Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532, 539 (7th Cir.1986); *Burdett Sound, Inc. v. Altec Corp.,* 515 F.2d 1245, 1249 (5th Cir. 1975) ("it is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business"). Where a monopoly exists, from the standpoint of antitrust law it is a matter of indifference whether one party versus another—in this case, one dealer versus another—exploits the monopoly. *Riegel,* 752 F.2d at 267.

In arguing the anticompetitive nature of defendant's refusal to deal plaintiffs, however, do not emphasize the effects on Channel 46. Rather, they argue the effects of Univision's conduct on advertisers, viewers, and Telemundo. It is uncertain whether Univision's actions toward advertisers constitute refusals to deal at all. Univision has not blocked access to its product, but instead has changed the terms and price which, as discussed above, is usually lawful. The same is generally true regarding viewers. Plaintiffs, however, have alleged or implied that the price to be charged viewers by the cable company will in fact prevent some viewers from obtaining any access to the station, and at this stage I will assume that indicates a refusal to deal.

Plaintiffs liken their antitrust claims to those in *Aspen Skiing, Byars,* and *Chase,* cases discussed at oral argument. In *Aspen Skiing* the defendant ("Ski Co.") terminated the "all-Aspen, six-day ticket," which was first developed when three independent companies (one of which was Ski Co.) operated three different ski mountains in the Aspen area. The ticket allowed Aspen visitors to ski the mountain of their choice on the day of their choice. The interchangeable ticket continued to

provide a desirable option for skiers when the market was enlarged to include a fourth mountain, also owned by Ski Co. Ski Co. thereafter acquired one of its competitor's mountains, giving it monopoly power. It then refused to continue the all-Aspen ticket, thereby refusing to deal with the remaining independent operator, Aspen Highlands Skiing Corp. ("Highlands"), and instead offered a similar ticket good only on its three mountains. Further, Ski Co. blocked Highlands' attempts to develop a substitute package by turning away skiers who attempted use the substitute package.

The Court upheld the jury's verdict that Ski Co. had committed unlawful anticompetitive conduct. While recognizing that "even a firm with monopoly power has no general duty to engage in a joint marketing program with a competitor," *Aspen Skiing,* 472 U.S. at 600, 105 S.Ct. 2847, the Court indicated that the right to refuse to deal with a competitor was not unqualified, *id.* at 601, 105 S.Ct. 2847. Ski Co. did not merely reject a novel offer to participate in a cooperative venture; rather, it elected to alter the character of the market itself—the all-Aspen ticket was the product of competition when the market contained three independent operators. *Id.* at 603–04, 105 S.Ct. 2847. While such a market change is not necessarily anticompetitive, the Court found evidence in the record that there were no valid business reasons for Ski Co.'s actions in terminating the all-Aspen ticket. Consumers were angered and were not skiing the mountain of their choice because their ticket would not permit it; Ski Co.'s rejection of skiers attempting to use the Highlands' substitute package indicated it chose to forgo the short-run benefits of those revenues in order to harm Highlands over the long run; and Ski Co. maintained similar all-area tickets in other locations where it owned ski resorts. As a result, the Court deemed Ski Co.'s conduct to be illegal anticompetitive behavior. *See id.* at 605–11, 105 S.Ct. 2847.

Plaintiffs attempt to draw parallels between *Aspen Skiing* and this case, arguing that there are no legitimate business reasons for Univision's switch to cable and that the switch will substantially change the market. However, the complaint does not allege that there are no legitimate business reasons for Univision's decision to switch to cable (a suggestion which Univision also vigorously disputes). And plaintiffs' argument that Univision's switch will change the market has no antitrust relevance in the present circumstances where Univision already has a one hundred percent monopoly. The fact that Univision presently broadcasts on free television is, unlike the situation in *Aspen Skiing*, not the result of an arrangement between competitors that permitted the market to function in a manner favorable to consumers. Rather, it was the result of Univision's unilateral decision upon entering the market. Univision's decision to switch to cable occurs in a context where no competition exists.

Following *Aspen Skiing*, the Seventh Circuit issued *Olympia*. There, Western Union, a monopolist of telex service, was forced to stop requiring subscribers to lease their telex terminals from it in order to obtain service. It then decided to sell off all of its terminal inventory to get out of the equipment business. At first Western Union gave subscribers a list of other vendors, including Olympia, from which they could purchase terminals. Western Union stopped the practice, though, when its own inventory of units was declining too slowly. Olympia sued under § 2 when its business then plummeted, as it had no sales staff of its own and relied upon the Western Union referrals. The court found no anticompetitive conduct when a monopolist extends a helping hand to competitors and then withdraws it. *Id.* at 375–76. In discussing *Aspen Skiing*, now-Chief Judge Posner indicated that *Aspen Skiing* was narrowly written. "If it stands for any principle that goes beyond its unusual facts, it is that a monopolist may be guilty of monopolization if it refuses to cooperate with a competitor in circumstances where some cooperation is indispensable to effective competition." *Id.* at 379. Unlike *Aspen Skiing* as interpreted in *Olympia*, in the present case there is no competitor with whom Univison could cooperate; the affirmative duties imposed upon the monopolist in *Aspen Skiing* thus are not appropriate in this case.

In *Chase*, 49 F.Supp.2d 553, Northwest Airlines was sued by an individual challenging the company's "refusal to sell" policy regarding "spoke-hub-spoke" tickets for "spoke-hub" travel. The case arose out of Northwest's policy of pricing tickets beginning or terminating at one of its three hubs at higher prices than tickets for travel merely going through the hubs. When hub-originating and hub-bound consumers began purchasing spoke-hub-spoke tickets and then disposing of the legs they did not need, Northwest instituted a policy of refusing to sell such passengers spoke-hub-spoke tickets, imposed the policy on any travel agents who wanted to sell Northwest tickets, and enforced the policy on passengers by requiring luggage to be checked through to the final destination and canceling any ticket with an abandoned leg. Northwest's motion to dismiss Chase's monopolization claim, based on Northwest's argument that its policy was not anticompetitive, was denied. The district court held that Chase sufficiently alleged an anticompetitive barrier to intrabrand competition because the refusal to sell policy interfered with how the competitive (between travel agents) intrabrand market operated.

Again, however, as with *Aspen Skiing*, Lerma's case is unlike *Chase* in that here, with Univision's one hundred percent monopoly, no competitive market exists, thus, there is no standard of competition Univision can be charged with altering. Plaintiffs have not alleged that Univision previously authorized two different stations to broadcast in Milwaukee (competing against each other) and then altered the market. Univision's switch to cable will not reduce the number of affiliates permit-

ted to broadcast Univision programming. Univision is simply replacing the current monopolist dealer with a different monopolist dealer, which generally is insignificant from an antitrust standpoint. *See Riegel,* 752 F.2d 261.

The *Byars* case involved another distinguishable scenario. For years, Byars distributed Bluff City's magazines to small neighborhood stores. After Bluff City changed ownership, the new owners decided to vertically integrate by taking over distribution themselves and eliminating the middleman Byars. Byars sued. The Sixth Circuit vacated the district court's decision for Bluff City, remanding for further findings on whether a refusal to deal occurred. *See Byars,* 609 F.2d at 864. Byars, however, was not a customer nor even simply a dealer of Bluff City. Although he started out as a dealer or distributor, upon Bluff City's vertical integration his position changed to that of competitor, and there was evidence that Bluff City attempted to squeeze him out of that role. Upon remand, the district judge was told to carefully consider whether Bluff City's vertical integration was justifiable on efficiency and business grounds and whether it had committed predatory conduct. Again, in the present case plaintiffs have not alleged that Univision's decision is not justifiable on business grounds nor that Univision is making a currently competitive market less competitive. And if Univision's actions can in someway be considered vertical integration (by cutting out the Channel 46 middleman in its current cable broadcasts), such vertical integration into distribution has been approved. *See Paschall v. Kansas City Star Co.,* 727 F.2d 692 (8th Cir.1984) (newspaper owner lawfully eliminated 250 independent carriers and took over retail business itself).

Lerma and Univision's viewers do not resemble customers whose rejection by a monopolist led to a finding of anticompetitive conduct, such as the Highlands skiers turned away by Ski Co. or the advertisers in *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). In *Lorain Journal,* the Supreme Court upheld a verdict that the one daily newspaper serving a small town violated § 2 by refusing to accept advertisements from customers who also advertised on a fledgling radio station, which was the newspaper's main competitor in the local advertising market. The Court found substantial evidence that the paper's conduct "amounted to an attempt by the publisher to destroy WEOL [the radio station] and, at the same time, to regain the publisher's pre–1948 substantial monopoly over the mass dissemination of all news and advertising." *Id.* at 153, 72 S.Ct. 181. Univision's Milwaukee viewers are unlike the advertisers in *Lorain Journal* and the skiers in *Aspen Skiing* in that Univision is not blocking them from, or penalizing them for, patronizing a competitor. The defendants in *Lorain Journal* and *Aspen Skiing* were acting to destroy the competitive market by depriving customers of choices. In this case, there is no competition in the relevant market, and thus no concern that Univision is eliminating consumer options in order to destroy a competitor.

As a result, because Lerma and Univision's viewers have not been blocked from or penalized for patronizing a competitor, are not victims of the alteration of a market characterized by competition, and are merely the subjects of a monopolist's right to raise its prices, they cannot show any anticompetitive conduct or effect merely because Univision refuses to deal with them.

My finding comports with the analysis of refusal to deal cases in Glazer's and Lipsky's 1995 article, *Unilateral Refusals to Deal Under Section 2 of the Sherman Act.* The authors divide refusal to deal cases into two groups that can lead to a finding of anticompetitive conduct: (1) "single monopoly cases," which include (a) refusals to deal with customers or suppliers that deal with the monopolist's competitors (as in *Lorain Journal* and *Aspen Skiing* ), (b) refusals to participate in a joint venture

with a competitor (as in *Aspen Skiing*), and (c) refusals to license technology to a competitor; and (2) refusals to deal to gain or protect a monopoly in another market (integration into complementary markets, for instance). Glazer, *supra*, at 767–780. The authors indicate that a third category exists as well, but it is one that generally does not lead to any illegality: cases where there is no competitive relationship between the monopolist and the party allegedly injured by the refusal. *Id.* at 781–82. This third category

> consists of cases in which there is no danger of preserving or extending monopoly. In the most familiar pattern, a monopolist supplier refuses to deal with firms playing a role in the distribution of the supplier's product....
>
> Another common scenario involves a monopolist supplier of goods or services refusing to deal with a purchasing consumer rather than with a distributor of its product....
>
> Finally, some cases involve refusals to deal representing pure monopolistic exploitation: a refusal to sell except at a high price or on terms reflecting an exercise of the bargaining power inherent in the defendant's market position.

*Id.* at 781–82. According to the authors, in all cases in this third category, the rule should be one of legality. *Id.* at 783. "Indeed, a monopolist invites erosion of its market position by discriminating among its customers or by exploiting them. Although neither ... is desirable, at least their tendency to encourage competitive erosion of the monopolist's position is consistent with antitrust objectives." *Id.* The complaints of Lerma and Univision's viewers fall into this third category.

**6.** There are no allegations or suggestions in the record that Telemundo is even interested in the relevant market or that it is a real competitor of Univision's in the sense of offering a similar product.

**7.** A facility is essential if it is necessary for access to the relevant market and competitor cannot practically or reasonably duplicate it. *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1132–

### 3. Market Entry Barrier For Telemundo or Other Potential Competitors

Plaintiffs have not alleged that defendant has refused to deal with competitors in Spanish-language programming, specifically Telemundo. There are no allegations, for instance, that Telemundo has attempted to enter the relevant market and been rebuffed by Univision [6] or that Univision is or controls an essential facility.[7] Instead, as the parties more clearly focused the issue at oral argument, because there currently is no competition in Spanish-language programming in the Milwaukee area, the key question is whether Univision's change to cable makes it more difficult for Telemundo (or any other competitor that may start up) to enter the market.

As stated above, monopolists, like any other businesses, usually may replace dealers and alter distribution methods without violating antitrust laws. If Univision were merely swapping one over-the-air broadcasting station for another in the Milwaukee area, there would be no anticompetitive effect. But does the fact that one distributor is an over-the-air broadcaster and the other is cable make a difference? And does plaintiffs' complaint actually allege that Univision's switch from Channel 46 to a direct feed to the cable television provider will make it more difficult for competitors to enter the Milwaukee area market?

Allegations in the complaint relating to this issue are sparse, but there are some:

> 18. To maintain access to Univision's Spanish-language programming, many

33 (7th Cir.1983). Examples are electrical transmission lines, *see Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), and the only railroad terminals in town, *see United States v. Terminal R.R. Ass'n,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912). Antitrust laws have imposed on firms controlling an essential facility the obligation to make the facility available to competitors on nondiscriminatory terms. *MCI,* 708 F.2d at 1132.

of the Milwaukee Area's Hispanic households undoubtedly will give in and purchase cable television packages. The remaining Hispanic households which do not, or cannot, purchase cable television will be too small in number to economically justify entry into the market by any other provider of free-broadcast Spanish-language programming (such as Telemundo). Univision's actions, therefore, will have the effect of erecting significant economic barriers which will foreclose other Spanish-language programming networks from entering the market.

. . . . .

29. Univision has violated Wis.Stat. § 133.03(2) by monopolizing the Milwaukee Area market for Spanish-language television programming, and by engaging in anticompetitive acts designed to, among other things, (a) erect barriers foreclosing other Spanish-language programmers/networks from entering the Milwaukee Area market. . . .

(Compl.¶¶ 18, 29.)

 In practice, a complaint must contain either direct or inferential allegations respecting all material elements necessary to sustain a recovery under some viable legal theory. *Car Carriers,* 745 F.2d at 1106. "The pleader may not evade these requirements by merely alleging a bare legal conclusion; if the facts do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs will get nowhere merely by dressing them up in the language of antitrust." *Id.* (internal quotation marks and citation omitted). "[I]nvocation of antitrust terms of art does not confer immunity from [dismissal]; to the contrary, these conclusory statements must be accompanied by supporting factual allegations." *Id.* at 1110.

 Further, in regard to determining whether an antitrust claim is stated, "the court is not required to don blinders and to ignore commercial reality." *Id.* To survive a motion to dismiss, a claim must make economic and factual sense. *See id.; cf. California Dental Ass'n v. Federal Trade Comm'n,* 526 U.S. ——, ——, 119 S.Ct. 1604, 143 L.Ed.2d 935, 67 U.S.L.W. 4365, 4370 (1999) (in case involving "quick took" at restraint of trade, court stated that unless economic view is implausible court should not initially dismiss it as presumptively wrong); *Matsushita,* 475 U.S. at 587, 596–97, 106 S.Ct. 1348. In *Car Carriers,* for instance, the court granted Ford's motion to dismiss, finding "implausible" and "preposterous" allegations in the complaint that Ford, having absolute control over and being highly concerned about the rates charged by its suppliers, would conspire with a company called Nu–Car to eliminate plaintiff from competition so Nu–Car could later charge Ford monopoly prices. *Car Carriers,* 745 F.2d at 1107 n. 4, 1110.

Lerma's key allegation—that "remaining Hispanic households which do not, or cannot, purchase cable television will be too small in number to economically justify entry into the market by any other provider of free-broadcast Spanish-language programming (such as Telemundo)"—is extremely conclusory and relies upon several factual assumptions, none of which is even alleged in the complaint. It assumes, for instance, that: (1) a competitor would itself choose over-the-air broadcasting versus cable; (2) assuming the competitor chose over-the-air broadcasting, the signal would not be picked up and rebroadcast by the cable provider;[8] (3) if the over-the-air signal is not picked up, cable viewers do not and will not change back and forth between cable television and over-the-air broadcasting; and (4) those Hispanic households that give in and purchase cable television to get Univision would not drop cable television if a competitor came into the geographic market with free over-the-

---

8. While plaintiff made some vague references at oral argument about a lack of space on the cable network for a second Spanish-language channel, there are absolutely no allegations in the complaint asserting that fact or that Univision has forced the cable provider, as controller of a possibly essential facility, to sign an exclusivity agreement.

air broadcasting. The failure of any one of these assumptions likely renders plaintiffs' barrier allegation false.

Federal Rule of Civil Procedure 8 requires simple notice pleading. While thin, the allegation itself is specific enough to inform Univision about the market entry barrier theory. *See, e.g., Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir.1994) (at pleading stage, plaintiff receives "the benefit of imagination, so long as the hypotheses are consistent with the complaint").

But plaintiffs' allegations about a potential market barrier fail to make factual and economic sense. For fraudulent joinder purposes, in order for me to deem the allegations inadequate, I must be able to say that, even assuming them to be true, Lerma cannot establish a cause of action against the defendant. *Poulos*, 959 F.2d at 73. If there is any reasonable possibility that a state court would rule against Univision, then the claim is not fraudulent. *Id.* If the allegations, though, are preposterous or implausible like the situation in *Car Carriers* or bare legal conclusions dressing up inadequate facts in antitrust lingo, the allegations cannot survive and will not block removal.

Besides being tenuous because of the underlying assumptions mentioned above, the market barrier allegation and some of the assumptions themselves run contrary to accepted economic theory. For instance, the assumption that once current over-the-air Hispanic viewers purchase cable they will not return to free television if a free-broadcaster appears in the market is implausible. It flies in the face of the accepted principle that a monopolist's higher prices in fact attract competitors because consumers will jump to a lower-cost provider. The Spanish-language television market is likely to be *more* rather than less attractive after Univision's move to cable. Telemundo has not chosen to

attempt to compete against Univision under current circumstances. It is hard to see how it could be more difficult to compete against Univision than it is now. As pled in the complaint, currently there are approximately 19,000 Hispanic households watching Spanish-language television in Milwaukee either via cable or over-the-air, all of whose viewing needs are satisfied by Univision. After the switch, of the approximately 11,000 current·over-the-air Univision viewers, say 6,000 choose to purchase cable television to get Univision broadcasting. That will leave 5,000 noncable viewers, *none* of whose viewing needs will be met by anyone. It seems to me that 5,000 people—whether affluent or not [9]—desperately wanting some Spanish-language programming is a more attractive market than 19,000 viewers who are fully satisfied by the present situation.

What if there currently were no Spanish-language programming at all in Milwaukee and Univision wanted to enter the market? Could plaintiffs stop Univision (or any other network) from choosing a direct cable feed rather than free-broadcasting, even when the company would be acquiring a monopoly? Although I did not pose this question to the parties and am not myself an economist, intuitively I think the answer must be no. If Univision, initially coming into the market and acquiring a monopoly, had chosen a direct cable feed rather than Channel 46's broadcasting, the resulting situation would not differ from that involving a switch from over-the-air to cable. The similarity of result in either situation makes it extremely implausible that Univision's jump to cable is unlawfully harmful to competition.

Moreover, such similarity highlights the fact that plaintiffs really have failed to allege any *misuse* of monopoly power at all. As plaintiffs themselves indicate, anticompetitive conduct is found when "a mo-

---

9. Plaintiffs suggested at oral argument that the viewers left behind after Univision's switch to cable will be those at the low-end of the economic scale who cannot afford cable, and they will be unattractive to Telemundo or any other competitor. No such allegation is made in the complaint, however, which focuses on numbers.

 

nopolist who claims to have lawfully acquired its power misuses it." (Pls.' Reply Br. at 7 (citing *Intergraph Corp. v. Intel Corp.,* 3 F.Supp.2d 1255 (N.D.Ala.1998); *see also* Pls.' 5/28/99 Letter to Court at 1 ("The thrust of plaintiffs' argument is that Univision may not use its dominant market power ... to create barriers that prevent others from competing here.").) *See also Kodak,* 504 U.S. at 482–83, 112 S.Ct. 2072 (second element of a § 2 claim is "use of *monopoly power*" to foreclose competition) (emphasis added)). Plaintiffs have failed to allege how Univision's switch to cable is enabled by or the result of Univision's dominant market power as opposed to being a choice any programmer— whether or not a monopoly and whether or not it is part of a competitive market— could make.

In sum, the allegation of a market entry barrier caused by too few viewers remaining after Hispanic households able to purchase cable television do so is a speculative, conclusory, and economically implausible prediction insufficient to sustain Lerma's claim.

## IV. CONCLUSION

Lerma's claim makes no factual and economic sense and fails to assert any form of anticompetitive conduct; it therefore fails to state an antitrust claim under Wis.Stat. § 133.03(2). The same problem defeats Omar's claim, and, in addition, the complaint fails to provide sufficient facts regarding Omar's relation to the relevant market.

I find that Lerma and Omar cannot possibly state a claim upon which a state court would find in their favor against Univision. As a result, they are both disregarded for diversity jurisdiction purposes, removal was proper, and the claims of these two plaintiffs will be dismissed.

With this Decision and Order, plaintiffs' motion to stay briefing regarding Univision's motion to dismiss becomes moot and will therefore be denied.

**THEREFORE, IT IS ORDERED** that plaintiffs' motion to remand is **DENIED.**

**IT IS ORDERED** that the claims of plaintiffs Lerma and Omar are **DISMISSED.**

**IT FURTHER IS ORDERED** that plaintiffs' motion to stay briefing and consideration of the pending motion to dismiss is **DENIED.**

**FINALLY, IT IS ORDERED** that a status conference to discuss the TRO motion, other pending motions, and scheduling of this case will be held on **June 15, 1999, at 1:30 p.m. in Room 204** of the United States Courthouse.